UNITED STATES of America,
Plaintiff,

v.

NEW YORK TIMES COMPANY et al.,
Defendants.

No. 71 Civ. 2662.

United States District Court,
S. D. New York.

June 15, 1971.

Motion for Preliminary Injunction
June 19, 1971.

Whitney North Seymour, Jr., U. S. Atty. for Southern Dist. of New York, for plaintiff, United States, by Michael D. Hess, Joseph D. Danas, Daniel Riesel,

Michael I. Saltzman, Milton Sherman, Howard S. Sussman, Asst. U. S. Attys., New York City.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendant New York Times Co., Alexander M. Bickel, New Haven, Conn., Floyd Abrams, William E. Hegarty, New York City, of counsel.

American Civil Liberties Union, New York Civil Liberties Union, by Norman Dorsen, Melvin L. Wulf, Osmond K. Fraenkel, Burt Newborne, National Emergency Civil Liberties Committee, by Victor Rabinowitz, Kristin Booth Glen, New York City, amici curiae.

MEMORANDUM

GURFEIN, District Judge.

The United States seeks a temporary restraining order and a preliminary injunction against The New York Times, its publisher and other officers and employees to restrain them from further dissemination or disclosure of certain alleged top secret or secret documents of the United States referred to in a verified complaint filed therewith.

I have granted the order to show cause as to why a preliminary injunction against the defendants should not be entered and have made it returnable Friday morning, June 18. Preliminarily thereto the Government has requested a temporary restraining order and also a direction from this Court to require the defendants to deliver to the Court certain documents and other tangible evidence to be held by the Court pending final determination of the cause. At this stage of the proceeding I do not direct The New York Times or the other defendants to produce the documents pending the outcome of the litigation. I do not believe that The New York Times will wilfully disregard the spirit of our restraining order. I am restraining The New York Times and the other defendants, however, from publishing or further disseminating or disclosing the documents consisting of 47 volumes entitled "HISTORY OF UNITED STATES DECISION MAKING PROCESS ON VIETNAM POLICY" covering the period 1945–67, prepared in 1967–1968 at the direction of the then Secretary of Defense Robert McNamara, the internal documents from which the aforesaid documents were prepared, and a one volume "COMMAND AND CONTROL STUDY OF THE TONKIN GULF INCIDENT" prepared in 1965 for the Joint Chiefs of Staff by the Weapons System Evaluation Group of the United States Department of Defense, pending the hearing of the Government's application for a preliminary injunction.

The questions raised by this action are serious and fundamental. They involve not only matters of procedure, but matters of substance and presumptively of constitutional implication as well. I have, in effect, been asked by the parties to pass upon the merits of the litigation upon the arguments made on the order to show cause. I believe that the matter is so important and so involved with the history of the relationship between the security of the Government and a free press that a more thorough briefing than the parties have had an opportunity to do is required. I have granted the restraining order because in my opinion any temporary harm that may result from not publishing during the pendency of the application for a preliminary injunction is far outweighed by the irreparable harm that could be done to the interests of the United States Government if it should ultimately prevail. I have intentionally expressed no opinion on the merits, but I believe this matter is brought in good faith by the United States and that on the balancing of interests mentioned, both parties deserve a full consideration of the issues raised.

Accordingly, the restraining order will be in effect until Saturday afternoon at one o'clock unless the Court directs otherwise.

The parties are requested to brief as thoroughly as possible the points adverted to in the oral argument by 5 p. m. Thursday, June 17, 1971.

### On Motion for Preliminary Injunction

On June 12, June 13 and June 14, 1971 The New York Times published summaries and portions of the text of two documents—certain volumes from a 1968 Pentagon study relating to Vietnam and a summary of a 1965 Defense Department study relating to the Tonkin Gulf incident. The United States sues to enjoin the Times from "further dissemination, disclosure or divulgence" of materials contained in the 1968 study of the decision making process with respect to Vietnam and the summary of the 1965 Tonkin Gulf study. In its application for a temporary restraining order the United States also asked the Court to order the Times to furnish to the Court all the documents involved so that they could be impounded pending a determination. On June 15 upon the argument of the order to show cause the Court entered a temporary restraining order against The New York Times in substance preventing the further publication until a determination by the Court upon the merits of the Government's application for a preliminary injunction. The Court at that time, in the absence of any evidence, refused to require the documents to be impounded.

The Government contends that the documents still unpublished and the information in the possession of the Times involve a serious breach of the security of the United States and that the further publication will cause "irreparable injury to the national defense."

The articles involved material that has been classified as Top Secret and Secret, although the Government concedes that these classifications are related to volumes rather than individual documents and that included within the volumes may be documents which should not be classified in such high categories. The documents involved are a 47 volume study entitled "HISTORY OF UNITED STATES DECISION MAKING PROCESS ON VIETNAM POLICY" and a document entitled "THE COMMAND AND CONTROL STUDY OF THE TONKIN GULF INCIDENT DONE BY THE DEFENSE DEPARTMENT'S WEAPONS SYSTEM EVALUATION GROUP IN 1965." There is no question that the documents are in the possession of the Times.

The issue of fact with respect to national security was resolved in the following manner. In view of the claim of the Government that testimony in support of its claim that publication of the documents would involve a serious security danger would in itself be dangerous the Court determined that under the "Secrets of State" doctrine an *in camera* proceeding should be held at which only the attorneys for each side, witnesses for the Government and two designated representatives of The New York Times would be present. It was believed that this would enable the Government to present its case forcefully and without restraint so that the accommodation of the national security interest with the rights of a free press could be determined with no holds barred. It was with reluctance that the Court granted a hearing from which the public was excluded, but it seemed that there was no other way to serve the needs of justice. My finding with respect to the testimony on security will be adverted to below.

1. This case is one of first impression. In the researches of both counsel and of the Court nobody has been able to find a case remotely resembling this one—where a claim is made that national security permits a prior restraint on the publication of a newspaper. The Times in affidavits has indicated a number of situations in which classified information has been "leaked" to the press without adverse governmental or judicial action. It cites news stories and the memoirs of public officials who have used (shortly after the events) classified material in explaining their versions of the decision making process. They point out that no action has ever been taken against any such publication of "leaks." The Government on the other hand points out that there has never been an attempt to publish such a massive compilation of documents which is probably unique in

the history of "leaks." The Vietnam study had been authorized by Secretary of Defense McNamara, continued under Secretary Clifford and finally delivered to Secretary of Defense Laird. The White House was not given a copy. The work was done by a group of historians, including certain persons on contract with the Government. It is actually called a "history." The documents in the Vietnam study relate to the period from 1945 to early 1968. There is no reference to any material subsequent to that date. The Tonkin Gulf incident analysis was prepared in 1965, six years ago. The Times contends that the material is historical and that the circumstance that it involves the decision making procedures of the Government is no different from the descriptions that have emerged in the writings of diarists and memoirists. The Government on the other hand contends that by reference to the totality of the studies an enemy might learn something about United States methods which he does not know, that references to past relationships with foreign governments might affect the conduct of our relations in the future and that the duty of public officials to advise their superiors frankly and freely in the decision making process would be impeded if it was believed that newspapers could with impunity publish such private information. These are indeed troublesome questions.

This case, in the judgment of the Court, was brought by the Government in absolute good faith to protect its security and not as a means of suppressing dissident or contrary political opinion. The issue is narrower—as to whether and to what degree the alleged security of the United States may "chill" the right of newspapers to publish. That the attempt by the Government to restrain the Times is not an act of attempted pre-censorship as such is also made clear by the historic nature of the documents themselves. It has been publicly stated that the present Administration had adopted a new policy with respect to Vietnam. Prior *policy* must, therefore,

be considered as history rather than as an assertion of present policy the implementation of which could be seriously damaged by the publication of these documents.

2. The Times contends that the Government has no inherent power to seek injunction against publication and that the power of the Court to grant such an injunction can be derived only from a statute. The Government has asserted a statutory authority for the injunction, namely, the Act of June 25, 1948, c. 645, 62 Stat. 736; Sept. 23, 1950, c. 1024, Tit. I, Sec. 18, 64 Stat. 1003 (18 U.S.C. 793). The Government contends moreover, that it has an inherent right to protect itself in its vital functions and that hence an injunction will lie even in the absence of a specific statute.

There seems little doubt that the Government may ask a Federal District Court for injunctive relief even in the absence of a specific statute authorizing such relief.

The Supreme Court has held that "(o)ur decisions have established * * * the general rule that the United States may sue to protect its interests * * * This rule is not necessarily inapplicable when the particular governmental interest sought to be protected is expressed in a statute carrying criminal penalties for its violation." Wyandotte Transp. Co. v. United States, 389 U.S. 191, 201–202, 88 S.Ct. 379, 386, 19 L.Ed.2d 407 (1967).

In recent times the United States has obtained an injunction against the State of Alabama from enforcing the miscegenation laws of that State. United States v. Brittain, D.C., 319 F.Supp. 1058, 1061. The United States has been held entitled to restrain a collection of a tax because "the interest of the national government in the proper implementation of its policies and programs involving the national defense is such as to vest in it the non-statutory right to maintain this action" United States v. Arlington County, 326 F.2d 929, 932–933 (4th Cir. 1964). Recently United States v.

Brand Jewelers, Inc., D.C., 318 F.Supp. 1293, 1299, a decision by Judge Frankel of this Court collects the authorities illustrating the various situations in which the classic case of In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092 (1895) has been cited. Accordingly, even in the absence of statute the Government's inherent right to protect itself from breaches of security is clear.

That, however, is only the threshold question. Assuming the right of the United States and, indeed, its duty in this case to attempt to restrain the further publication of these documents, the Government claims and the Times denies that there is any statute which *proscribes* such publication. The argument requires an analysis of the various sections (792–799) contained in Chapter 37 of Title 18 of the U. S. Criminal Code entitled "ESPIONAGE AND CENSORSHIP." The statute seems to be divided into two parts. The first which for lack of a better term may be considered simple espionage, and the second, the publication of information. The Government relies upon Section 793. There are two subsections concerning which the question of interpretation has arisen. Subsection (d) deals with persons with *lawful* possession—"whoever, *lawfully* having possession of * * * any document, writing, code book, [etc.] * * * relating to the national defense or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation * * * " It seems clear that neither the Times nor the Government now claim that subsection (d) applies since it is fairly obvious that "lawful" possession means the possession of Government officials or others who have *authorized* possession of the documents. The Government, however, relies on subsection (e) which reads as follows:

"(e) Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it; or"

It will be noted that the word "publication" does not appear in this section. The Government contends that the word "communicates" covers the publication by a newspaper of the material interdicted by the subsection. A careful reading of the section would indicate that this is truly an espionage section where what is prohibited is the secret or clandestine communication to a person not entitled to receive it where the possessor has reason to believe that it may be used to the injury of the United States or the advantage of any foreign nation. This conclusion is fortified by the circumstance that in other sections of Chapter 37 there is specific reference to publication. The distinction is sharply made in Section 794 entitled "Gathering or delivering defense information to aid foreign government." Subsection (a) deals with peace-time communication of documents, writings, code books, etc. relating to national defense. It does not use the word "publication." Subsection (b) on the other hand which deals with "in time of war" does punish anyone who "publishes" specific information "with respect to the movement, numbers, description, condition, or disposition of any of the Armed Forces, ships, aircraft, or war materials of the United States, or with respect to the plans or conduct, or supposed plans or conduct of any naval or military operations, or

with respect to any works or measures undertaken for or connected with, or intended for the fortification or defense of any place, or any other information relating to the public defense, which might be useful to the enemy * * * "

Similarly, in Section 797 one who publishes, photographs, sketches, etc. of vital military and naval installations or equipment is subject to punishment. And finally, in Section 798 which deals with "Disclosure of Classified Information" there is a specific prohibition against one who "publishes" any classified information. This classified information is limited to the nature, preparation, or use of any code, cipher, or cryptographic system of the United States or any foreign government; or the design, construction, use, maintenance, or repair of any device, apparatus, or appliance used or prepared or planned for use by the United States or any foreign government for cryptographic or communication intelligence purposes; or the communication intelligence activities of the United States or any foreign government; or obtained by the processes of communication intelligence from the communications of any foreign government, knowing the same to have been obtained by such processes.

■ The Government does not contend, nor do the facts indicate, that the publication of the documents in question would disclose the types of classified information specifically prohibited by the Congress. Aside from the internal evidence of the language of the various sections as indicating that newspapers were not intended by Congress to come within the purview of Section 793, there is Congressional history to support the conclusion. Section 793 derives from the original espionage act of 1917 (Act of June 15, 1917, Chap. 30, Title I, Sections 1, 2, 4, 6, 40 Stat. 217, 218, 219). At that time there was proposed in H.R. 291 a provision that "(d)uring any national emergency resulting from a war to which the United States is a party or from threat of such a war, the President may, by proclamation, prohibit the publishing or communicating of, or the attempting to publish or communicate any information relating to the national defense, which in his judgment is of such character that it is or might be useful to the enemy." This provision for prior restraint on publication for security reasons limited to war time or threat of war was voted down by the Congress. In the debate Senator Ashhurst in a scholarly speech stated the problem as follows:

> "Freedom of the press means simply, solely, and only the right to be free from a precensorship, the right to be free from the restraints of a censor. In other words, under the Constitution as amended by amendment No. 1, 'freedom of the press' means nothing except that the citizen is guaranteed that he may publish whatever he sees fit and not be subjected to pains and penalties because he did not consult the censor before doing so." *

It would appear, therefore, that Congress recognizing the Constitutional problems of the First Amendment with respect to free press, refused to include a form of precensorship even in war time.

In 1957 the report of the United States Commission on Government Security in urging further safeguards against publication of matters affecting national security recognized that "any statute designed to correct this difficulty must necessarily minimize constitutional objections by maintaining the proper balance between the guarantee of the first amendment, on one hand, and required measures to establish a needed safeguard against any real danger to our national security." Report of the United States Commission on Government Security 619–20 (1957).

* The First Amendment reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Senator Cotton, a sponsor of the bill, recognized in debate that "it should be made crystal clear that at the present time penalties for disclosure of secret information can only be applied against those employed by the Government. The recommendation extended such control over those outside the Government." The bill proposed was never passed. The significance lies, however, in the awareness by the Congress of the problems of prior restraint and its determination to reject them except in the limited cases involved in Section 794 and Section 798 involving codes, communication intelligence, and the like.

■■■ The injunction sought by the Government must, therefore, rest upon the premise that in the absence of statutory authority there is inherent power in the Executive to protect the national security. It was conceded at the argument that there is Constitutional power to restrain serious security breaches vitally affecting the interests of the Nation. This Court does not doubt the right of the Government to injunctive relief against a newspaper that is about to publish information or documents absolutely vital to current national security. But it does not find that to be the case here. Nor does this Court have to pass on the delicate question of the power of the President in the absence of legislation to protect the functioning of his prerogatives—the conduct of foreign relations, the right to impartial advice and military security, for the responsibility of which the Executive is charged against private citizens who are not Government officials. For I am constrained to find as a fact that the *in camera* proceedings at which representatives of the Department of State, Department of Defense and the Joint Chiefs of Staff testified, did not convince this Court that the publication of these historical documents would seriously breach the national security. It is true, of course, that any breach of security will cause the jitters in the security agencies themselves and indeed in foreign governments who deal with us. But to sustain a preliminary injunction the Government would have to establish not only irreparable injury, but also the probability of success in the litigation itself. It is true that the Court has not been able to read through the many volumes of documents in the history of Vietnam, but it did give the Government an opportunity to pinpoint what it believed to be vital breaches to our national security of sufficient impact to controvert the right of a free press. Without revealing the content of the testimony, suffice it to say that no cogent reasons were advanced as to why these documents except in the general framework of embarrassment previously mentioned, would vitally affect the security of the Nation. In the light of such a finding the inquiry must end. If the statute (18 U.S.C. 793) were applicable (which I must assume as an alternative so that this decision may be reviewed by an appellate court), it is doubtful that it could be applied to the activities of the New York Times. For it would be necessary to find as an element of the violation a willful belief that the information to be published "could be used to the injury of the United States or to the advantage of any foreign nation." That this is an essential element of the offense is clear. Gorin v. United States, 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488 (1941).

I find that there is no reasonable likelihood of the Government successfully proving that the actions of the Times were not in good faith, nor is there irreparable injury to the Government. This has been an effort on the part of the Times to vindicate the right of the public to know. It is not a case involving an intent to communicate vital secrets for the benefit of a foreign government or to the detriment of the United States.

■■■ 3. As a general matter we start with the proposition that prior restraint on publication is unconstitutional. Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). As the Supreme Court observed in Gros-

jean v. American Press Co., Inc., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660:

"The predominant purpose of the * * * (First Amendment) was to preserve an untrammeled press as a vital source of public information. The newspapers, magazines, and other journals of the country, it is safe to say, have shed and continue to shed, more light on the public and business affairs of the nation than any other instrumentality of publicity; and since informed public opinion is the most potent of all restraints upon misgovernment, the suppression or abridgement of the publicity afforded by a free press cannot be regarded otherwise than with grave concern." (297 U.S. at 250, 56 S.Ct. at 449)

Yet the free press provision of the First Amendment is not absolute. Near v. Minnesota ex rel. Olson, *supra.* In the *Near* case the Court said that "no one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." The illustrations accent how limited is the field of security protection in the context of the compelling force of First Amendment right. The First Amendment concept of a "free press" must be read in the light of the struggle of free men against prior restraint of publication. From the time of Blackstone it was a tenet of the founding fathers that precensorship was the primary evil to be dealt with in the First Amendment. Fortunately upon the facts adduced in this case there is no sharp clash such as might have appeared between the vital security interest of the Nation and the compelling Constitutional doctrine against prior restraint. If there be some embarrassment to the Government in se-curity aspects as remote as the general embarrassment that flows from any security breach, we must learn to live with it. The security of the Nation is not at the ramparts alone. Security also lies in the value of our free institutions. A cantankerous press, an obstinate press, an ubiquitous press must be suffered by those in authority in order to preserve the even greater values of freedom of expression and the right of the people to know. In this case there has been no attempt by the Government at political suppression. There has been no attempt to stifle criticism. Yet in the last analysis it is not merely the opinion of the editorial writer or of the columnist which is protected by the First Amendment. It is the free flow of information so that the public will be informed about the Government and its actions.

These are troubled times. There is no greater safety valve for discontent and cynicism about the affairs of Government than freedom of expression in any form. This has been the genius of our institutions throughout our history. It is one of the marked traits of our national life that distinguish us from other nations under different forms of government.

For the reasons given the Court will not continue the restraining order which expires today and will deny the application of the Government for a preliminary injunction. The temporary restraining order will continue, however, until such time during the day as the Government may seek a stay from a Judge of the Court of Appeals for the Second Circuit.

The foregoing shall constitute the Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure.

So ordered.