Argued November 26, 1975, affirmed as modified and remanded
February 3, reconsideration denied March 10, petition for review
denied March 31, 1976

In the Matter of L., a Minor Child.
STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY, *Respondent,*

*v.*

L., a Minor Child, *Respondent,*
CHILDREN'S SERVICES DIVISION, *Appellant.*

(No. 26,835-A, CA 5362)

546 P2d 153

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, and Kathryn V. Kelty, Assistant Attorney General, Salem.

*David L. Slader,* Child Advocacy Project of the Metropolitan Public Defender, Portland, argued the cause for respondent child. With him on the joint brief of respondent child and amicus curiae was Kathleen Nachtigal, Portland.

No appearance by respondent Juvenile Department.

Before Schwab, Chief Judge, and Foley and Thornton, Judges.

FOLEY. J.

**FOLEY, J.**

The state appeals from a circuit court order requiring the placement of L, a 13-year-old child with severe emotional problems, for treatment at the Chazen Institute in Arizona in accordance with the proposed treatment plan formulated by the Children's Services Division (CSD). CSD declined to place L in the Institute because it determined it had exhausted that portion of its budget allocated for the placement of children in out-of-state programs. The juvenile court found that funds were available and that CSD's failure to utilize them for L's treatment was an arbitrary and capricious abuse of its discretion. On appeal, the state's principal contention is that the court exceeded its authority in ordering the treatment.[1]

L was removed from her parental home when she was 11 years old after a long and disturbing history of sexual abuse by her stepfather and the child's rejection by her mother. She was first sexually assaulted when she was five years old. Since CSD took custody of the child, she has been placed in a number of institutional and foster homes and has spent a considerable

---

[1] The only additional question on appeal is whether the juvenile court committed reversible error by permitting the presence of a newspaper reporter during the hearing over the objections of the child's attorney and counsel for CSD. Since juvenile hearings are customarily closed to members of the public, it was advisable for the judge to inform the parties in advance that a reporter would be present at the hearing. However, his failure to do so was not reversible error since he was authorized to admit any person he determined had a proper interest in the case or the workings of the juvenile court. ORS 419.498(1) provides that:

"The hearing shall be held informally by the court without a jury and may be continued from time to time. Unless the child or his parents otherwise request, the general public shall be excluded and only such persons admitted as the judge finds have a proper interest in the case or the work of the court. The judge may exclude the public during any portion of the hearing in which it appears that the presence of the public may embarrass a witness or party or otherwise prejudice the reception of trustworthy evidence. With the consent of the child or his parents, at any stage of the proceeding the court may separately interview the child or one of his parents."

That the judge acted well within his discretion is readily apparent from his explanation for admitting the reporter:

"THE COURT: * * * [T]he reporter is here with the permission of

amount of time in juvenile detention. During the year and a half preceding the hearing L ran away from these homes at least 15 times and was often picked up in various parts of the state in the company of older boys and young men.

In August 1975, L was admitted to the Oregon State Hospital for a 30-day psychiatric examination. The report resulting from this evaluation included the following account of L's condition and corresponding recommendations for treatment:

"* * * * *

"[L] has an established pattern of runaway behavior since age 12. She has been unable to remain in any placement longer than four weeks at a time. This supports a previously noted inability on her part to form any meaningful relationships. * * *

"* * * [S]he does exhibit to a marked degree a tendency to act on impulse. * * * This demonstrates her lack of internal controls and this necessity for structure and external controls at this time.

"* * * * *

"The following opinions are the result of such evaluation:

"1. [L] shows no evidence of any mental defect or illness.

---

the Court because the Court feels this is a case of special, particular significance to the people of the State of Oregon and because the Court knows from its own experience this is not an isolated incident where this particular issue has been involved, and the Court feels that one of the reasons we have this problem is because the people of the State of Oregon and, specifically, members of the Legislature, are not really aware of the magnitude of the problem; and I believe it is the function of the press as well as the function of all of us to see that the people of this state and, particularly, members of the Legislature, are confronted with the grave reality and stark reality of children in need in this state whose needs are not being met now; and I can't do that, and I think that the press can.

"Exercising my discretion under the statute, I have allowed the press to be present."

We note that the record indicates the judge consulted with the reporter before the hearing and instructed him not to print L's name or anything about the case which would make it possible for L to be identified as an individual. Finally, as the attorney for the child and amicus curiae correctly point out, the public exposure of L's life could only be error with respect to L and was not prejudicial to CSD.

[ 260 ]

"2. She should not be placed in foster care.

"3. Placement should be in a setting such as Hillcrest.[2] Such institution should have a structured setting with external controls, adequate schooling and activity for an active girl of this age group and preferably a minimum of sexual stimulation.

"* * * * *."

Because no program approximating the recommended setting existed in the state, L's caseworker submitted to the juvenile court a plan for the closely supervised care and treatment of L at the Chazen Institute in Arizona. The caseworker added, however, that this placement was not feasible because of inadequate funding for the placement of children in out-of-state programs.

"I have referred [L] for placement at the Chazen Institute in Tucson, Arizona as this treatment center meets the treatment components as outlined in the recommendation from the Oregon State Hospital. It is not a locked center but it is a very secure setting with runs discouraged not only by the large staff ratio of 2-1, but also by its location away from an urban community. It is a very structured behavior modification program where all privileges must be earned and there are definite, predictable consequences for negative behavior. There is a school program and there are appropriate activities for a teenager, as recommended by Dr. Davis. While Chazen Institute would be the treatment of choice, we will not be able to place [L] there as there is no money in Children's Services Division's budget for out of state placements.

"In the meantime [L] is in * * * [a foster home] which I have given a conditional certification.* * *

"My current plan is to supervise [L] in * * * [the foster home] until money becomes available in CSD's budget for out of state placement."

The legislature has authorized the expenditure of approximately $37 million by CSD for Family Foster Care and Purchase of Care during the 1975-77 bien-

---

[2]Under a recent amendment to ORS 419.509(1), L's placement at Hillcrest School of Oregon would be unlawful. (Oregon Laws 1975, ch 718, § 3.)

nium. Oregon Laws 1975, ch 541. Although the legislature did not specify in this authorization that only a certain proportion of the fund would be available for the purchase of care without the state, the budget report of the Joint Committee on Ways and Means shows that $150,000 of the authorization was approved for the cost of care through the biennium for emotionally disturbed children who were already receiving treatment in out-of-state programs. The administrator of CSD testified at the hearing that the $150,000 had been appropriated for this purpose and that no additional funding was available for the purchase of out-of-state care for children such as L.

There also was evidence adduced at the hearing indicating that surplus monies were available for the purchase of care within the state. However, the administrator testified that in view of the limitation of $150,000 designated in the committee's budget report, he would not use any of these monies for the purchase of additional out-of-state care absent further legislative direction. Notwithstanding this position, no emergency funds were requested by CSD for out-of-state placement of children, such as L, who are not retarded or psychotic but are emotionally disturbed and in need of a secure, therapeutic setting. It was undisputed at the time of hearing that no appropriate facility for such children was located within the state.

The state concedes that L has not been afforded treatment but argues that the juvenile court was without authority to order it because CSD had exhausted the funds available to it for the purchase of out-of-state care.

The juvenile court obtained jurisdiction over L as a ward of the court under ORS 419.476 which provides in pertinent part:

"(1) The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

"* * * * *

"(e) Either his parents or any other person having his custody have abandoned him, failed to provide him with the support or education required by law, subjected him to cruelty or depravity or to unexplained physical injury or failed to provide him with the care, guidance and protection necessary for his physical, mental or emotional well-being; or

"* * * * *."

Hence, the basis of the court's jurisdiction was a determination that L was not receiving the "care, guidance and protection necessary for [her] physical, mental or emotional well-being."

The basis of the juvenile court's subsequent commitment of L to the legal custody of CSD under ORS 419.507(2)(e) was her special need for care and treatment. That statute provides:

"A child found to be within the jurisdiction of the court as provided in subsection (1) of ORS 419.476, may be made a ward of the court. Where a child has been found to be within its jurisdiction, and when the court determines it would be in the best interest and welfare of the child, the court may:

"* * * * *

"(2) Place the child in the legal custody of the Children's Services Division for care, placement and supervision.

"* * * * *

"(e) Whenever a child who is in need of medical care or other special treatment by reason of his physical or mental condition is placed in the custody of the Children's Services Division by the juvenile court, the division shall prepare a plan for care or treatment within 14 days after assuming custody of the child. The court may indicate in general terms the type of care which it regards as initially appropriate. A copy of the plan, including a time schedule for its implementation, shall be sent to the juvenile court which committed the child to the division. The court may at any time request regular progress reports on implementation of the plan. The division shall notify the court when the plan is implemented, and shall report to the court concerning

[ 263 ]

the progress of the child annually thereafter. If the plan is subsequently revised, the division shall notify the court of the revisions and the reasons therefor.

"* * * * *."

Thus, when a child is committed to the custody of CSD, ORS 419.507(2)(e) requires the adoption of a treatment plan within 14 days after CSD assumes custody of a child, together with a specific time schedule for implementation of the plan. The statute establishes a continuing relationship between CSD and the court to insure, so far as is possible, that a child is afforded treatment commensurate with his or her particular needs. The legislature has authorized the court to "indicate in general terms the type of care which it regards as initially appropriate" and "at any time request regular progress reports on implementation of the plan." CSD is charged with the responsibility of furnishing the court with a treatment plan and a time schedule for its implementation; further, CSD is required to notify the court when the plan is implemented and submit annual progress reports thereafter.

To determine the effect of ORS 419.507(2)(e) in this particular case, we construe the statute *in pari materia* with the Juvenile Court Act as a whole. *See, e.g., Children's Services Div. v. Weaver,* 19 Or App 574, 528 P2d 556 (1974). We are also guided by the legislative directive encompassed in ORS 419.474(2):

"The provisions of ORS 419.472 to 419.587 shall be liberally construed to the end that a child coming within the jurisdiction of the court may receive such care, guidance and control, preferably in his own home, as will lead to the child's welfare and the best interests of the public, and that when a child is removed from the control of his parents the court may secure for him care that best meets the needs of the child."

The thrust of this statutory scheme is treatment. CSD is charged with the responsibility of securing treatment for a child and the court is positioned in a

watchful, supervisory role to see that the child actually receives responsive treatment. The overall purpose of this relationship between the court and CSD is to maximize the quality of treatment afforded to such children while the baseline objective is to guarantee that each child actually receives some treatment responsive to his or her particular needs. The entire foundation of the relationship thus secured is the improvement of the child's condition. Mere custodial care which is not designed to cure or improve the child's condition falls short of the care contemplated by the statute.

■ In accordance with this statutory scheme, CSD submitted to the court the above-quoted plan for the care and treatment of L. It is of little significance whether the plan is read as proposing L's placement at the Chazen Institute in the indefinite future or proposing her immediate placement in a foster home. In either case, the juvenile court was authorized under ORS 419.507(2)(e) to order treatment because L was not receiving treatment and CSD had not advised the court of a time limitation within which L would be afforded treatment. Although temporary placement in a foster home under such circumstances may oftentimes be unavoidable, here CSD failed to establish any specific time schedule for implementation of a treatment plan.

■ The record in this case unequivocally shows that the severity of L's emotional problems and her proven tendency to run away renders foster care an inappropriate setting for treatment responsive to her emotional problems. Indeed, the psychiatric evaluation of L resulted in an express recommendation against her continued placement in foster care. Manifestly, the "need" for "special treatment" which was the basis of the court's commitment of L to the custody of CSD was not met by her placement in foster care. If treatment as a standard or requirement is to mean anything at all in this context, it must entail systematic attention

to a child which is responsive to his or her particular emotional problems as diagnosed after extensive psychiatric examination. This is not to say that we prescribe any particular form of treatment or that we are here reviewing the adequacy of any particular form of treatment. This is a case where no treatment has been provided. We hold only that the legislature has entitled those children committed to the custody of CSD to some form of responsive treatment when the need for treatment is the basis of commitment and that CSD's custody of a child pursuant to ORS 419.507(2)(e) may be terminated when treatment is not provided.

In essence, the juvenile court judge was faced with a situation where a ward of the court in dire need of treatment was receiving none and where the responsible state agency had given the court no assurance that treatment was forthcoming. Confronted with this danger to L's chances for a normal, useful life, the court acted within its authority to effectuate L's right to treatment under ORS 419.507(2)(e) by ordering her immediate placement in the only program which the evidence indicated would constitute treatment for L.[3] *See In re Sampson,* 65 Misc2d 658, 317 NYS2d 641 (Family Ct, Ulster Co 1970); 37 App Div 2d 668, 323 NYS2d 253 (1971), *affirmed,* 328 NYS2d 686, 29 NY2d 900, 278 NE2d 918 (1972).

---

[3] Absent a statutory entitlement to treatment, this case would raise a serious and difficult question as to whether the placement of L in foster care under the circumstances was a deprivation of a constitutionally grounded right to treatment. *See O'Connor v. Donaldson,* 422 US 563, 95 S Ct 2486, 45 L Ed 2d 396 (1975); *Jackson v. Indiana,* 406 US 715, 92 S Ct 1845, 32 L Ed 2d 435 (1972); *Rouse v. Cameron,* 373 F2d 451 (DC Cir 1966); *Wyatt v. Stickney,* 325 F Supp 781 (MD Ala 1971); *see generally,* Schwitzgebel, *The Right to Effective Mental Treatment,* 62 Cal L Rev 936 (1974). In *Jackson v. Indiana,* supra, the Supreme Court said:

"At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual [was] committed." 406 US at 738.

In view of the severity of L's emotional problems, it is doubtful whether foster care could fairly be seen as bearing a reasonable relationship to L's need for responsive treatment.

Any question concerning the court's authority to exercise continuing jurisdiction over L by ordering her placement in the Chazen Institute is put to rest by the legislature's 1973 amendment to ORS 419.507 which provides:

"Commitment of a child to the Children's Services Division does not terminate the court's continuing jurisdiction to protect the rights of the child or his parents or guardians." ORS 419.507(2)(f).

"The legislative history of the statute during the 1973 Session indicates that subsection (f) was added in response to the Court of Appeals' decision which was described to the legislature to mean that 'once we [the juvenile court] commit to the Children's Services Division, we have no control of the child.'

"Presently, as a result of the amendment, the juvenile court's jurisdiction continues *in all matters* affecting the protection of the rights of the child or his parents or guardians. * * *'' (Brackets theirs.) (Emphasis supplied.) *State ex rel Juv. Dept. v. Richardson,* 267 Or 374, 378, 517 P2d 270 (1973).

In *Richardson* it was held that the juvenile court's jurisdiction continues with respect to the exercise of discretion over parental visitation.

In *Children's Services Div. v. Weaver,* 19 Or App 574, 528 P2d 556 (1974), this court upheld an order of permanent commitment which the juvenile court had conditioned upon a showing, within 90 days, of CSD's bona fide efforts to arrange for the child's adoption. Following *Richardson,* we said that "the right of a child to enjoy membership in a permanent home and family while he is still young" was contemplated as a matter over which the juvenile court could properly exercise its continuing jurisdiction. 19 Or App at 578. The juvenile court now has authority to exercise continuing jurisdiction over a child in need of special treatment who has been committed to the custody of CSD for the purpose of treatment under ORS 419.507(2)(e) where, as here, the child is not receiving

responsive treatment and CSD has not provided the court with a reasonable time schedule within which the child will receive such treatment.[4]

■■ The court exceeded its authority, however, to the extent that CSD was ordered to provide treatment irrespective of the budgetary limitations imposed upon CSD by the legislature. We do not find it necessary to determine as a factual matter whether CSD was financially able to secure for L the needed treatment. Indeed, we are very much aware that such a determination is peculiarly a legislative function. *See, e.g., Smith v. County of Washington,* 241 Or 380, 406 P2d 545 (1965). It was for CSD to determine whether funding was available to it and, if it were not, to further determine whether emergency funding should be sought where, as here, an emotionally disturbed child in its custody was not receiving treatment. The judiciary is not empowered to review either of the above agency determinations or to compel an agency to expend monies it has determined are not available to it. Nevertheless, the juvenile court was empowered to render an alternative order requiring CSD to secure treatment for L or to certify to the court that it was without funding to do so. In the event that CSD certifies that it is not able to provide treatment, the court is authorized to terminate CSD's custody of the child since the statutory basis for CSD's custody no longer exists when it becomes evident that CSD will not provide a child with responsive treatment.

---

[4]Under the extraordinary facts of this case, the court also had authority to order L's placement in a suitable facility for special treatment under ORS 419.511(2), which provides that:

"The court may, in lieu of or in addition to any disposition under subsections (1) to (3) of ORS 419.507, direct that the child be examined or treated by a physician, psychiatrist or psychologist, or receive other special care or treatment and for that purpose may place the child in a hospital or other suitable facility."

This provision empowers the juvenile court to order special treatment when CSD has not furnished a child with responsive treatment and treatment is not forthcoming. We express no opinion, however, as to other circumstances which would justify a court in ordering special care or treatment under this statute.

Affirmed as modified and remanded.

**THORNTON, J.,** dissenting.

The legislature has unequivocally vested the juvenile court with continuing authority and responsibility for the care and protection of children under its jurisdiction. ORS 419.507 (as amended in 1973). *See, State ex rel Juv. Dept. v. Richardson,* 267 Or 374, 378, 517 P2d 270 (1973). In my view the majority opinion is now sanctioning the impairing and weakening of the court's authority. The opinion says that L is legally entitled to special treatment on the one hand; then says in effect that the juvenile court should not put undue pressure on the Children's Services Division (CSD) to provide it.

This case comes down to a question of whether CSD is actually without available funds to provide this treatment.

The director of CSD testified that there was an available surplus of funds for treatment of such children at in-state facilities at substantially the same cost. Therefore I am not prepared to say that the trial judge erred in concluding that CSD should have tried to obtain authority from the Emergency Board to transfer its in-state care surplus to the out-of-state category in order to comply with the court's order.

ORS 291.326(1)(d) provides:

"(1) The Emergency Board, during the interim between sessions of the Legislative Assembly, may exercise the following powers:

"* * * * *

"(d) Where an emergency exists, to revise or amend the budgets of state agencies to the extent of *authorizing transfers between expenditure classifications within the budget of an agency.*" (Emphasis supplied.)

In *Norman v. Van Elsberg,* 262 Or 286, 497 P2d 204 (1972), the statute in issue there authorized judges of juvenile courts to fix salaries of juvenile counselors

but also provided that such salary must be approved by the budget-making body of the county. Our Supreme Court, in reversing this court, held that the statute meant that juvenile court judges were to have authority to fix salaries subject to scrutiny of the budget-making body of the county only for the purpose of rejecting the proposed salaries if they were found to be unreasonable; that the word "approved" did not mean that budget-making body of county had final authority to designate juvenile counselors' salaries.

In the case at bar I would agree that under the separation of powers doctrine the juvenile court has no authority to order the legislature or the Emergency Board to appropriate necessary funds. I do not, however, construe the court's order as constituting such action.

Following the rationale of *Norman v. Van Elsberg,* supra, and *Children's Services Div v. Weaver,* 19 Or App 574, 528 P2d 556 (1974), I would modify the order of the trial court by providing that CSD is directed to apply to the Emergency Board for that Board's approval or rejection of either of the following: (a) authority for CSD to make the above transfer of funds, or, in the alternative, (b) allocation of sufficient additional funds to provide the subject treatment for L, or show cause why such action is not taken, and affirm as thus modified.