Argued and submitted March 26,
peremptory writ to issue June 18, 1980

# STATE ex rel OREGONIAN PUBLISHING COMPANY et al,
*Plaintiffs-Relators,*

*v.*

# DEIZ,
*Defendant.*

## (SC 26832)

613 P2d 23

James T. Marquoit, of Saxon & Marquoit, Portland, argued the cause and filed the brief for defendant.

James H. Clarke, of Spears, Lubersky, Campbell & Bledsoe, Portland, argued the cause for plaintiffs-relators. With him on the briefs were Michael G. Holmes and Frank M. Parisi, Portland.

James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Karen H. Green, Assistant Attorney General, Salem, filed the brief amicus curiae on behalf of the State of Oregon.

Charles F. Hinkle and E. Walter Van Valkenburg, Portland, filed the brief amicus curiae on behalf of American Civil Liberties Union of Oregon, Inc.

Before Denecke, Chief Justice, and Howell, Lent, Linde, Peterson and Tanzer, Justices.

DENECKE, C. J.

## DENECKE, C. J.

The issue in this mandamus proceeding is the right of the press to attend all hearings in a juvenile court proceeding in which a 13-year-old girl was in custody in connection with the drowning of a younger child. The plaintiff, Oregonian Publishing Company, is a newspaper publisher; the plaintiff Whitney is a reporter employed by the Oregonian; the defendant is a circuit court judge.

Another judge started the juvenile proceeding and barred the press from the courtroom. The Oregonian nevertheless learned the identity of the 13-year-old juvenile and her identity was published in several newspapers. Subsequently, the Oregonian filed a motion to be permitted to attend the hearings involving the juvenile. In support, the managing editor of the Oregonian filed an affidavit stating that there was strong public interest in this juvenile proceeding. The juvenile opposed the motion. The defendant denied this motion and subsequently barred Whitney, the reporter, from a hearing in the same case and the court reaffirmed its intention to exclude the press from all future hearings in the case. The Oregonian and Whitney petitioned for a writ of mandamus and we issued an alternative writ, to which defendant demurred.

The plaintiffs first contend that they are entitled to attend the hearings under the provisions of ORS 419.498(1). That statute provides:

"* * * Unless the child or parents otherwise request, the general public shall be excluded and only such persons admitted *as the judge finds have a proper interest in the case or the work of the court.* The judge may exclude the public during any portion of the hearing in which it appears that the presence of the public may embarrass a witness or party or otherwise prejudice the reception of trustworthy evidence. * * *" (Emphasis added.)

The plaintiffs contend that the press should be found to have a "proper interest" in the case because

it is important for the public to be informed about the workings of the juvenile justice system and the press informs the public.

The statute in point was enacted in 1959 as part of a thorough revision of the Oregon Juvenile Code. Or Laws 1959, ch 432, § 14. The legislation was adopted upon the recommendation of a legislative interim committee consisting of legislators, judges, lawyers and other interested parties. The interim committee borrowed freely from the provisions of the Standard Juvenile Court Act, including much of the text of ORS 419.498(1).[1]

The interim committee report evinces a strong commitment to the *parens patriae* theory of juvenile justice. This theory contemplates a nonadversary, quiet and relatively private proceeding. The interim committee reported: "The publicity, excitement and tension of a criminal trial often has a serious adverse effect on a child, particularly a young child." Report of the Legislative Interim Committee on Judicial Administration, Part II at p 11 (1959).

The authors of the Standard Act made like statements and added: "The hearing should have the character of a conference, not of a trial." National Council on Crime and Delinquency, Standard Juvenile Court Act, comment on § 19 (6th ed 1959), reprinted in 5 National Probation and Parole Assn. Journal, 323, 368 (1959). The exponents of the *parens patriae* approach also favored privacy because of their belief that exposing a child's misdeeds to the community would reinforce the delinquent's negative self-image and, therefore, impede rehabilitation. Howard, Grisso

---

[1] The Standard Act, § 19, stated as follows:

"*.* * The general public shall be excluded, and only such persons shall be admitted who are found by the judge to have a direct interest in the case or in the work of the court.* * *" National Council On Crime and Delinquency, Standard Juvenile Court Act, Sixth Ed (1959), reprinted in 5 National Probation and Parole Assn. Journal 323, 367 (1959).

and Neems, Publicity and Juvenile Court Proceedings, 11 Clearinghouse Rev 203 (1977). The defendant judge in this case is of the same opinion.

■ For these reasons the statute grants broad authority to the juvenile court judge to control access to the courtroom. The statute authorizes the judge to admit only persons the court finds have a proper interest in the case or the work of the court. The statute offers no guidance on the issue of what constitutes a "proper interest." That omission persuades us that the legislature intended that the juvenile judge have wide latitude in determining when a person seeking admission to the proceedings has a "proper interest."

■ ORS 419.498(1) does not single out the press for special treatment. With the interim committee's concern with the potential adverse impact of publicity, we conclude that the press are members of the public and may be excluded when the juvenile court is of the opinion that privacy would promote the goals of juvenile justice.

■ The plaintiffs cite decisions from other jurisdictions and from the Oregon Court of Appeals in which it was held that ORS 419.498(1) or its equivalent permitted the admission of the press to a juvenile hearing despite the opposition of the child. See for example *State ex rel Juvenile Dept. v. L.,* 24 Or App 257, 546 P2d 153, rev den (1976). In all of these cases, however, the juvenile court had admitted members of the press and the juvenile sought higher court assistance in reversing such order. The decision did not hold the juvenile judge was required to admit the press. These cases unanimously support our conclusion that ORS 419.498(1) and like statutes entrust the decision to admit or exclude reporters to the discretion of the juvenile court. The defendant judge acted within her statutory powers in excluding the press in this case.

Having concluded the judge acted within her statutory authority, we must consider the plaintiffs' contention that the application of the statute in this

case is invalid as it is contrary to Art I, § 10 of the Oregon Constitution.

Art I, § 10 of the Oregon Constitution states: "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay * * *." Although this language was enacted as part of the Constitution of 1859, it has not been authoritatively construed.

The plaintiffs contend it means what it literally states; that is, all proceedings before Oregon courts are required to be open to the public, including representatives of the news media. The defendant responds that Art I, § 10 grants the right to an open trial solely to the litigants and not to the public. The defendant points out that the Sixth Amendment to the United States Constitution, as interpreted by *Gannett Co. v. DePasquale,* 443 US 368, 99 S Ct 2898, 61 L Ed2d 608 (1979), provides a right solely for the accused and not for the public or the press. According to this view, under Art I, § 10, the juvenile court could close the courtroom if the child did not object or requested that it be closed.

■ One weakness in defendant's contention is that the language of the Oregon constitutional provision, Art I, § 10, and the Sixth Amendment are substantially different. The Sixth Amendment provides: "the accused shall enjoy the right to a speedy and public trial * * *." The court said in *Gannett,* 443 US at 380: "Our cases have uniformly recognized the public trial guarantee as one created for the benefit of the defendant." Art I, § 10, on the other hand, does not provide that the accused or anyone else has the right to a public trial. It provides flatly that no court shall be secret and justice shall be administered openly. This prohibition can inure to the benefit of individuals but the sweeping language with which the prohibition is written makes it unreasonable to interpret it to be merely a grant of a right to an individual that can be waived or which would vanish if not affirmatively raised by the individual.

This interpretation of Art I, § 10 is buttressed by the presence of the next section of the Bill of Rights in the Oregon Constitution, Art I, § 11. The first sentence of § 11 is a paraphrase of the Sixth Amendment. The sentence states: "In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; * * *." This section is a guarantee of individual rights. The enumeration of these individual rights accentuates that the previous section with its provision that "no court shall be secret" must concern more than rights guaranteed to individuals.

The defendant further contends: "In theory, the public has no interest in [juvenile] proceedings, as the role of judicial monitor is assumed by each parent." But Art I, 10 does not recognize distinctions between various kinds of judicial proceedings; it applies to all.

The Attorney General, appearing as amicus curiae, argues that we should not enforce the express terms of Art I, § 10 because the generation that adopted it did not intend the prohibition to be literally applied. He supports that argument by pointing out that section 898 of the original Code of Civil Procedure, enacted in 1862 and retained in the current code as ORS 1.040, provides:

> "The sittings of every court of justice are public, except that upon the agreement of the parties to a civil action, suit or proceeding, filed with the clerk or entered upon the journal, the court may direct the trial, or any other proceeding therein, to be private; upon such order being made, all persons shall be excluded, except the officers of the court, the parties, their witnesses and counsel."

The state believes the contemporaneous enactment of this statute creates an inference that the framers of the Constitution, many of whom were legislators in 1862, would not have enacted § 898 if they had intended Art I, § 10 to require that all civil proceedings be open to the public.

■ This is a dubious inference. Contemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles. Constitutional draftsmen are concerned with broad principles of long-range significance; legislators are more likely to be concerned with the immediate. We have observed a political temptation to adopt an ideal as an abstract principle and then substantially undercut the ideal in order to accommodate an immediate concern. For example, the political generation that adopted the first amendment also attempted to suppress political criticism by enacting the Alien and Sedition Acts.

■ We hold the order of the defendant judge barring plaintiffs from the hearings is invalid as contrary to Art I, 10.

Our holding, however, should not be interpreted as guaranteeing the right of public access to all judicial proceedings.

■ One obvious limitation is that jury deliberations and court conferences have been and are held in private. We are of the opinion that despite the absence of any language in Art I, § 10 expressly excluding jury deliberation from the prohibition against secret deliberations, the tradition that such proceedings be held in private was so long and so well established in 1859 that the tradition should be read into the section. See *Clark v. United States,* 289 US 1, 13, 53 S Ct 465, 77 L Ed 993 (1933); *State v. Lehnherr,* 30 Or App 1033, 1039, 569 P2d 54 (1977), construing Art I, §§ 10 and 11. The same is true of conferences of collegial courts.

If there is a question of whether access to court proceedings can be limited by the Fourteenth Amendment guarantee of a fair trial, it has not been raised and, therefore, we do not address it. Likewise, we do not address the question of whether certain persons can be excluded from certain court proceedings.

■      We limit our holding to directing the defend-
ant to permit the "press" to attend because that is
what the alternative writ orders. However, the public
has a right of access co-extensive with the press. On
the other hand, the trial court retains the right to
control access by members of the press or public who
would overcrowd the courtroom, attempt to interfere
in the proceedings or otherwise obstruct the proceed-
ings.

A peremptory writ shall issue directing the
defendant to permit the press to attend subsequent
proceedings in the underlying juvenile proceeding.

**LENT, J.,** concurring.

I agree with what the majority has to say
about the effect of both Article I, section 10, of the
Oregon Constitution and ORS 419.498(1). I under-
stand the desire to reach and decide those issues. I do
not agree, however, that it was necessary to do so in
the case at bar.

ORS 419.498(1), in pertinent part, provides:
 "* * * Unless the child or his parents otherwise
request, the general public shall be excluded and only
such persons admitted *as the judge finds have a
proper interest in the case or the work of the court.* The
judge may exclude the public during any portion of
the hearing in which it appears that the presence of
the public may embarrass a witness or party or other-
wise prejudice the reception of trustworthy evidence.
* * *." (Empahsis added.)

It appears to me that the statute requires that if the
judge finds that a person has a "proper interest" in the
case or the work of the court, that person must be
admitted, subject to the possible exception that such
person may yet be excluded if that person's presence
might embarrass a witness or party or otherwise prej-
udice the reception of trustworthy evidence.

In this case, the writ alleges that plaintiffs-
relators have a proper interest in the underlying case
and in the work of the court with respect thereto.

The demurrer by the defendant admits that allegation. True, there is no allegation that "the judge" has found such a "proper interest," but the demurrer by the defendant judge admits the allegation that relators have such an interest and, in my opinion, is equivalent to the necessary finding.

I concur that a peremptory writ must issue.

**LINDE, J.,** concurring.

I join in the Chief Justice's opinion for the Court. Because of the contemporary prominence of issues concerning secrecy in court proceedings, it seems worthwhile in a few words to draw attention to the significance of points that in the public discussion of these issues are easily overlooked or misunderstood. One is the extent to which some aspects of constitutional liberty in this federal nation rest on the independent importance of state constitutional guarantees. Another is that issues of secrecy in court proceedings are confined neither to criminal proceedings nor to some special aspect of freedom of the press.

In modern times the impression probably has become widespread that a question of constitutional law is not settled until the United States Supreme Court settles it, and that it cannot be settled differently from that Court's decision. That is half true. It is true only when a state denies someone a right guaranteed by the United States Constitution. It is not true when a state's constitution provides more or stronger guarantees than the national minimum. This is such a case.

As the Court's opinion sets forth, Oregon's Constitution guarantees the open and visible administration of justice, not only honest and complete and timely justice, but justice that can be seen to be so during and after the event. In the words of article I, section 10:

"No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

Since the beginning of statehood in 1859, this guarantee has appeared in the Bill of Rights between the guarantees of freedom of expression, article I, section 8, and the special rights of persons accused of crime, article I, section 11. Freedom of expression, in Oregon, does not single out the professional press. In article I, section 8, it is phrased as follows:

"No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."[1]

It assures reporters and editors, along with any other observer or interested citizen, the freedom to discuss what they know, or think they know, or surmise, or advocate, without fear of sanctions beyond civil damages for private harm. *See Wheeler v. Green,* 286 Or 99, 117-119, 593 P2d 777 (1979). But this unrestrained freedom to speak, write, print, and express opinions "on any subject whatever" is not itself an "Open, Sesame" to public offices, or records, or other information. It does not give journalists a constitutional claim to the information which it gives them the freedom to publish. That they are left to get for themselves.

---

[1] *Compare* U S Const amend I: "Congress shall make no law . . . abridging the freedom of speech, or of the press . . .," *and see* Stewart, *"Or of the Press,"* 26 Hast L J 631 (1975); Nimmer, *Introduction—Is Freedom of the Press a Redundancy: What Does it Add to Freedom of Speech?* 26 Hast L J 639 (1975); Lange, *The Speech and Press Clauses,* 23 UCLA L Rev 77 (1975).

This court has repeatedly held that article I, section 8, applies before and independently of any issue under the first amendment, so as to invalidate spending limits on political campaigning, *Deras v. Myers,* 272 Or 47, 535 P2d 541 (1975), punitive damages in defamation cases, *Wheeler v. Green,* 286 Or 99, 117-119, 593 P2d 777 (1979), and laws which as written are directed against speech or expression that may under any circumstances be constitutionally privileged, *State v. Spencer,* 289 Or 225, 611 P2d 1147 (1980).

It would do freedom of inquiry, of reporting, and of comment a great disservice to equate it with a general or public right to information, for there is much that government may legally keep undisclosed. If the press claimed a right to demand whatever information it has a right to publish, it would soon have a right to publish only that which it has a right to demand. But the constitutional freedom to speak and write is far wider than "the public's right to know," and no one who cares about the one would want it measured by the other.

In short, a guarantee against censorship does not itself serve as a public meeting or public records act.[2] The rights of the press and others under article I, section 8, like the rights of an accused under article I, section 11, are guarantees of personal freedom against oppressive governmental power. Article I, section 10, plays a different role. It is one of those provisions of the constitution that prescribe how the functions of government shall be conducted. One somewhat parallel provision is the command of article IV, section 14, that the deliberations of the legislative houses and all their committees shall be open, a provision which also guarantees a public process rather than private rights. There it concerns openness in making law for the future. Here it is the judicial function, that function which brings the law to bear on individuals and puts the generalities of policy to the test of the concrete case.

How this is done, and whether it is done according to law, "without purchase, completely and without delay," in the words of article I, section 10, has public importance beyond the preferences of the parties to the case. This, at least, is the view that shaped our constitution. Thus the command that "justice shall be administered openly" is not one within the dis-

---

[2] *See* ORS 192.410 - 192.690.

posal of the parties or the court.[3] Nor is the public importance of visibility in the administration of justice confined to the administration of criminal justice. There it serves to assure accountability for the charge not prosecuted, the reduced plea accepted, the evidence used or not used, and particularly to forestall suspicion that political considerations entered a case behind closed doors. *See, e.g., United States v. Cianfrani,* 573 F2d 835 (3d Cir 1978) (on defendant's motion to close proceedings in a prosecution for misuse of public office); *Welch v. United States,* 371 F2d 287, 290 (10th Cir), *cert den* 385 US 957, 87 S Ct 395, 17 LEd2d 303 (1966) (referring to defendant's motion to hear witnesses in chambers).[4]

However, we need few reminders that the public importance of openness is not so limited. In recent memory, the efforts to censor the New York Times, the Washington Post, and the Progressive magazine were civil cases. In the Pentagon Papers case, the government went to extraordinary lengths to involve the courts in issuing judicial orders on secret evidence.[5] That would not be possible in an Oregon

---

[3] Some states have reached similar results under other provisions of state law, *e.g. Shiras v. Britt,* 267 Ark 97, 589 SW2d 18 (1979); *Keene Publishing Corp. v. Cheshire County Superior Court,* 119 NH 710, 406 A2d 137 (1979). The Supreme Court of Pennsylvania recently reached a different conclusion under that state's constitution, which provides that "all courts shall be open." *Commonwealth v. Hayes,* 489 Pa 419, 414 A2d 318 (1980). Whether or not a provision so phrased should be construed to mean no more than that the courts will be open to litigants, such a construction is impossible for our provision that "justice shall be administered openly." A Virginia decision allowing a closed trial is currently on review in the United States Supreme Court, presumably because the Virginia courts found nothing in the law of that state to the contrary. *Richmond Newspapers, Inc. v. Virginia* (Va S Ct, Jul 9, 1979), *appeal docketed* 48 LW 3178 (No. 79-243, 1979 Term), *jurisdiction pending oral argument* 48 LW 3241, *oral argument* 48 LW 3553 (1979).

[4] There has also been speculation that the Watergate scandal might not have been uncovered if reporters had not been able to attend the bail hearing for the suspects initially caught in the Watergate burglary, *see* Zion, *High Court vs. The Press,* NY Times, Nov 18, 1979 (Magazine) at 145.

[5] *See United States v. New York Times Co.,* 328 F Supp 324, 326, *aff'd,* 403 US 713, 91 S Ct 2140, 29 L Ed 2d 822 (1971); S. Ungar, The Papers & The Papers 164-203.

court. In retrospect James Madison might perhaps regret that he did not think it necessary to include in the United States Constitution a text on open courts as well as a First Amendment.

It is obvious, for reasons of space alone, that a guarantee of open courts does not guarantee any one person a "right" to be present. Justice is nonetheless openly administered when one or another person is for good cause prevented from attending. Of course, those admitted or excluded may not be selected for their view of the case at issue, as is reported about trials in some other countries. Nor could it be consistent with this guarantee to exclude anyone who may later disclose that which is being "openly administered." In any event, if the constitutional freedom to speak and write adds anything to article I, section 10, it is the right not to be selectively excluded on the ground that one may intend to exercise that freedom.

With these additional comments, I concur in the opinion of the Court.

**HOWELL, J.,** dissenting.

I agree with that portion of the majority opinion which holds that ORS 419.498(1) grants wide latitude to the juvenile judge to admit or exclude the press from juvenile hearings. I also agree with the majority's reasoning that privacy would promote the goals of juvenile justice and that publicity could have an adverse affect on the child's rehabilitation. I do not agree with the remainder of the decision that ORS 419.498(1) is unconstitutional because it violates article I, section 10, of the Oregon Constitution.

Our task is to determine the intention of the framers of our constitution in enacting article I, section 10, and I do not believe that they intended to prohibit the legislature from closing certain trials or hearings to the press and public in the interest of justice.

The majority concludes that article I, section 10, applies to all judicial proceedings, guarantees individuals the right to a public trial, and also guarantees the public that all trials be "public" trials, by conferring upon the press and the public an absolute and unrestricted right to attend juvenile hearings and civil trials. I do not believe that either the language or the history of article I, section 10, supports the majority's position.

Article I, section 10, is concerned with the administration of justice in all cases both civil and criminal when it states that "no court shall be secret but justice shall be administered, openly and without purchase * * *." The very next constitutional provision, article I, section 11, refers to criminal prosecutions and guarantees the accused the right to a "public trial." Although the drafters could have explicitly stated that the public shall be admitted to all civil and criminal judicial proceedings, they did not use such language in article I, section 10. In article I, section 11, however, the drafters specifically said: "In all criminal prosecutions, the accused shall have the right to public trial * * *." If the majority is correct, that the drafters intended article I, section 10, to contain a constitutional right of public attendance at all *civil* and *criminal* court proceedings, then the constitutional right of an accused to a public trial contained in article I, section 11, is redundant and unnecessary. On the contrary, I believe that the reason the drafters provided an accused with a right to a public trial in article I, section 11, is because they did not mandate that all trials be public trials in article I, section 10.

Furthermore, I do not believe that constitutional and statutory history supports the position of the majority. In 1862, just five years after the constitutional convention of 1857 adopted article I, section 10, the Oregon Legislature Assembly adopted Oregon's first Code of Civil Procedure, which contained the following statute:

> "The sittings of every court of justice are public, except as provided in this section. Upon the agreement of the parties to a civil action, suit or proceeding, filed with the clerk or entered upon the journal, the court may direct the trial of an issue of law or fact, or any other proceeding therein, to be private; and upon such order being made, all persons shall be excluded except the officers of the court, the parties, their witnesses and counsel." Chapter XI, Title VII, Section 898. *See* Deady, General Laws of Oregon (1843-1872) 288 (1874).

This provision has been retained, virtually unchanged, in the Oregon statutes. *See* ORS 1.040. If the drafters of article I, section 10, intended that provision to contain an *absolute* right of public attendance, then it seems unlikely that some of them would have enacted the above statute with the memory of the debates of the constitutional convention still fresh in their minds.

The majority dismisses this argument by saying that

> " * * * *Contemporaneous legislative actions should not necessarily be given much weight when construing constitutional principles.* Constitutional draftsmen are concerned with broad principles of long-range significance; legislators are more likely to be concerned with the immediate. * * *." Majority opinion at 284 (emphasis added).

The majority, however, ignores the fact that this court has considered legislative action in construing constitional principles. For example, in *State v. Finch,* 54 Or 482, 103 P 505 (1909), this court held that article I, section 15, of the Oregon Constitution, declaring that laws for the punishment of crimes shall be founded on principles of reformation and not vindictive justice, does not prohibit the infliction of the death penalty as punishment for murder in the first degree. Mr. Justice McBride, delivering the opinion for a unanimous court, explained that there are three canons of interpretation that may be applied to article I, section

15, and tested by any one of the canons, article I, section 15, does not prohibit imposition of the death penalty.

> "The first test, and one to which great weight is to be attached, is contemporaneous construction, and long acquiescence by the courts and legislatures: Endlich, Interpretation of Statutes, § 527. The present constitution was framed and adopted in 1857, and the State was admitted into the Union in 1859. By the provisions of the constitution the laws of the territory of Oregon were continued in force 'so far as applicable' under the State government. The territorial law inflicted the death penalty for murder in the first degree, and no change was made in that penalty, or in the law itself, until the adoption of the Codes of 1864, when the same law, with the same penalty was re-enacted, with some slight amendments. During the interval the death penalty was not infrequently imposed and carried into effect. Among the members of the constitutional convention were Judges Boise, Prim, Shattuck, Kelly, Kelsay and Wait, all of whom were afterwards members of the Supreme Court of this State, and all of whom, excepting Judge Kelly, performed circuit duty. It is part of the judicial history of this State that all of these eminent jurists either pronounced the sentence of death while upon circuit duty, or participated in affirming such judgments when sitting upon the supreme bench. Rousseau well observes that 'He who made the law knows best how it ought to be interpreted,' and this judicial and legislative recognition of the validity of capital punishment by the very men who framed the constitution ought itself to be sufficient answer to the contention of defendant's counsel." *Id.* at 496-97.

The fact that article I, section 10, which states that no court shall be secret, was followed almost immediately by a legislative enactment providing for nonpublic trials in civil cases indicates, I believe, that the drafters of the constitution did not intend "secret" to mean that the court should always be open to the press and public in all cases. Since the adoption of article I, section 10, and the enactment of the 1862

statute providing for private court proceedings, the legislature has enacted other statutes allowing for private proceedings in the interests of justice. For example, in 1937 the legislature provided that the issue of paternity in bastardy-filiation proceedings be determined in a private hearing. Or Laws 1937, ch 324, § 1; ORS 109.155)1). The legislature also permits private guardianship proceedings for those alleged to be incapacitated. ORS 126.103(5). And, because of the sensitive nature of a rape trial, the legislature permits a private court hearing to determine the admissibility of evidence of the sexual character of the rape victim. ORS 163.475(4). These are just a few examples of court proceedings where, in the interests of justice, the legislature has determined the press and public may or should be excluded.

The majority holds, and I agree, that the legislature believed that privacy in juvenile hearings would promote the ends of justice. I would hold that the legislature may therefore provide for the closing of juvenile hearings to the press and public without violating article I, section 10,.

I would dismiss the writ.