Argued and submitted May 15, rules held valid September 9, petition for review allowed December 8, 1998 (328 Or 115)

OREGON NEWSPAPER
PUBLISHERS ASSOCIATION,
a not for profit association,
J. Leroy Yorgason, its President,
Willamette Valley Chapter of
Society of Professional Journalists,
a not for profit society of journalists,
Rob Priewe, chapter President,
The Associated Press,
a not for profit news cooperative,
Elaine Norton Hooker,
its Chief of Bureau for Portland, Oregon,
The Oregon Publishing Company,
an Oregon corporation,
The Oregon Association of Broadcasters,
a non-profit association,
Bill Johnstone, its executive director,
The Statesman Journal,
a daily newspaper published in Salem, Oregon,
and Julia Wallace, its Executive Editor,
*Petitioners,*

*v.*

DEPARTMENT OF CORRECTIONS
and State of Oregon,
*Respondents.*

(CA A97110)

966 P2d 819

Les Swanson, Jr., argued the cause and filed the briefs for petitioners.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong, Judge, and Warden, Senior Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Petitioners raise constitutional challenges to OAR 291-024-0017(2)(b), (c) and (e), OAR 291-024-0020(3)(d)(D), OAR 291-024-0065, OAR 291-024-0070 and OAR 291-024-0080, all of which were promulgated by the Department of Corrections (Department) on February 7, 1997, regarding the witnessing of executions of prison inmates. Petitioners contend that the rules violate Article I, section 8, and Article I, section 10, of the Oregon Constitution, and the First and Fourteenth Amendments to the United States Constitution. We affirm.

■        Petitioners attack the constitutionality of the rules pursuant to ORS 183.400.[1] Under that statute, our review is limited to whether the rules violate the state and federal constitutions on their face. *AFSCME Local 2623 v. Dept of Corrections*, 315 Or 74, 79, 843 P2d 409 (1992).[2]

## I.   THE RIGHT TO VIEW PRE-EXECUTION PROCEDURES

■        We first address petitioners' claim that they have a right to view procedures that occur during the preparation

---

[1] ORS 183.400 provides, in part:

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. * * *

"* * * * *

"(4) The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions[.]"

[2] In *AFSCME*, 315 Or at 79, the court explained:

"We emphasize at the outset the limited scope of the Court of Appeals' review (and ours) under ORS 183.400. Aside from questions that might arise concerning the facts surrounding the process of adopting a rule—questions not raised in this case—judicial review under ORS 183.400 is limited to the face of the rule and the law pertinent to it. Numerous individual fact situations can arise under any rule, but judicial review of the rule as applied to each of those situations is reserved to other forums. ORS 183.400(1). *See, e.g.*, ORS 183.482, ORS 183.484 (providing for judicial review of agency orders in various fact-specific situations). Petitioners' petition for review in this case refers to actions alleged to be occurring pursuant to the rules at issue here, but the legality of any particular application of the rules is premature, and not subject to review under ORS 183.400."

The court applied its holding in *AFSCME* regarding the scope of appellate review under ORS 183.400 in *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 464-65, 900 P2d 495 (1995), *cert den* 517 US 1155 (1996).

for an inmate's execution. In essence, OAR 291-024-0065, OAR 291-024-0070 and OAR 291-024-0080 prevent all witnesses from viewing the inmate until after the inmate is strapped down and the intravenous catheter, through which the death-causing drugs will be administered, has been inserted. We address plaintiffs' state constitutional claims first and then their federal constitutional claims.

Article I, section 10, of the Oregon Constitution, provides, in part, that, "[n]o court shall be secret, but *justice shall be administered*, openly and without purchase, completely and without delay." (Emphasis supplied.) The phrase "justice shall be administered" has been interpreted by the Supreme Court to be limited to "adjudications." In *Oregonian Publishing Co. v. O'Leary*, 303 Or 297, 303, 736 P2d 173 (1987), the court explained that "[t]he primary limitation on the scope of section 10 is that it is directed only at *adjudications*. To the extent that adjudications are not involved, the administration of justice is not governed by it." (Emphasis supplied.) The parties also agree that the threshold issue in this case is whether the execution of an inmate is an "adjudication" within the meaning of section 10.

The state argues that "adjudications" are limited to judicial proceedings and actions by judges. It asserts that because an execution of an inmate is not a judicial proceeding, it cannot be an "adjudication." On the other hand, petitioners assert that "[t]he ultimate adjudication issued by an Oregon Court is the judgment of death." They explain:

> "An adjudication of death is not complete until death occurs, and the fact that the execution of the judgment of death occurs after the judgment of death is pronounced, does not insulate this single most powerful act that the state is authorized to perform from the open administration of justice provision of Article I, section 10, of the Oregon Constitution."

The issue necessarily turns on the definition of "adjudication" for purposes of section 10.

There are a number of cases that have interpreted the clause "justice shall be administered, openly and without purchase, completely and without delay." One of the earlier cases is *State v. Endsley*, 214 Or 537, 546, 331 P2d 338 (1958).

In that case, the court limited section 10 issues to those "adjudicated in a circuit court." *Id.* In *State ex rel Oregonian Pub. Co. v. Deiz*, 289 Or 277, 284, 613 P2d 23 (1980), the court held that Article I, section 10, guarantees a right of access to the public to most *judicial proceedings*. It explained, however, that section 10 does not guarantee access to all judicial proceedings; for example, jury deliberations have historically been closed to the public. The holding in *Deiz* illustrates that not all proceedings that occur in a court are "adjudications" in the sense contemplated by section 10. In *Oregonian Publishing Co.*, the plaintiff newspaper sought access to a summary hearing in a murder trial regarding whether a witness who refused to testify on the ground that he would incriminate himself could be compelled to testify. Pursuant to a statute, the defendant trial judge ruled that the hearing was closed to the public. The court noted that, although section 10 is absolute in its terms, not every proceeding involving the administration of justice is required to be open to public scrutiny. The court said that, "[t]he primary limitation on the scope of section 10 is that it is directed only at adjudications. To the extent that adjudications are not involved, the administration of justice is not governed by it." 303 Or at 303. The court then reasoned that because a fundamental function of a court is to determine legal rights based on the presentation of evidence and argument, the legal determination required by the statute at issue constituted an "adjudication" within the meaning of section 10. *Id.*

In *State v. Wagner*, 305 Or 115, 146, 752 P2d 1136 (1988), *vacated on other grounds* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989), *rev'd in part on other grounds* 309 Or 5, 786 P2d 93, *cert den* 498 US 879, 111 S Ct 212, 112 L Ed 2d 171 (1990), the defendant argued that the death penalty violated section 10 "because it is incompatible with the concept of complete justice." In response, the court pointed out that the death penalty statutes were adopted by an overwhelming majority of Oregon voters and held that the administration of "justice" required by section 10 is served "[i]f defendant received a trial and sentence according to those and other applicable laws." Although the issue in this case was not directly before the *Wagner* court, its refusal to extend section 10 protection beyond the trial and sentencing proceedings is

instructive. In another case involving the death penalty, the court, relying on *Wagner*, held that Article I, section 10, does not mandate that post-conviction proceedings be litigated to a conclusion before a death penalty sentence could be executed. *Bryant v. Thompson*, 324 Or 141, 147, 922 P2d 1219 (1996). Finally, in *Flowers v. Board of Parole*, 124 Or App 331, 334-35, 862 P2d 1312 (1993), *rev den* 318 Or 325 (1994), we refused to extend the protection of section 10 to a parole board hearing because it was an administrative proceeding and not a hearing in a court of law.[3]

The case law confining section 10 protection to those proceedings in courts in which legal rights are determined based on a presentation of evidence and argument is consistent with the history underlying Article I, section 10. Section 10 has its origin in Article 40 of the Magna Carta (1215), and Lord Edward Coke's discussion of the Magna Carta in *The Second Part of the Institutes of the Lawes of England* (1642) (*Second Institutes*), which were written to reform corruption in the common-law courts. During that historical period, the King and his ministers would consult with judges on pending cases and exert political pressure on them that interfered with the integrity of the adjudicatory process. *Bryant*, 324 Or at 147-48. *See also* Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions*, 74 Or L Rev 1279 (1995) (discussing the historical roots of Article I, section 10). There is no suggestion that Coke was concerned with subsequent events that took place pursuant to court orders but outside the court.

As we have indicated, the case law pertaining to and the history of section 10 do not support petitioners' argument that the execution process is an adjudicatory proceeding within the meaning of section 10. An execution does not

---

[3] Moreover, the Supreme Court has consistently defined the word "adjudication" in other contexts as an event that occurs in judicial proceedings. In *Vasquez v. Courtney*, 272 Or 477, 479, 537 P2d 536 (1975), the court stated that "[a]n 'adjudication' is defined as 'the giving or pronouncing a judgment or decree in a cause.'" Black's Law Dictionary (Rev 4th Ed 1968)." In *State v. Hoffman*, 236 Or 98, 103, 385 P2d 741 (1963), the court defined "adjudication" as "a final judgment of the court, that is, it involves an exercise of the judicial power in hearing and determining the issues and rendering a judgment thereon."

involve a determination of a legal right based on the presentation of evidence and argument. There is another reason why petitioners' argument is not well taken that is self-evident. The execution of a prison inmate is not carried out by the Judicial Branch of government. Rather, it is a function of the Executive Branch of government. As indicated, all of the cases that have addressed the meaning of the phrase "justice shall be administered" in section 10 have consistently limited its applications and adjudications to judicial functions. For all of these reasons, we conclude that an execution is not an "adjudication" and that, therefore, petitioners do not have a right under section 10 to view the procedures leading up to an inmate's execution.

■    Petitioners also contend that Article I, section 8, of the Oregon Constitution, implicitly guarantees them the right to view the procedures leading up to an inmate's execution. Article I, section 8, of the Oregon Constitution, provides that, "[n]o law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right." Petitioners do not cite to any Oregon appellate case in which Article I, section 8, has been interpreted to encompass the right of public access to a government activity.[4] Instead, they rely on case law where the issue was whether the First Amendment provides a right of access for the media and the public to attend procedures occurring in criminal trials. *See, e.g., Richmond Newspapers, Inc. v. Virginia*, 448 US 555, 100 S Ct 2814, 65 L Ed 2d 973 (1980).

In *Richmond Newspapers*, the issue was whether the trial court erred when it excluded the media from pretrial hearings. The court reasoned that criminal trials were historically open to the public and that "a presumption of openness inheres in the very nature of a criminal trial under our system of justice." *Id.* at 573. The court explained that, "[t]he

---

[4] In fact, it is far from clear that section 8 extends to access to government records. In *State ex rel KOIN-TV v. Olsen*, 300 Or 392, 400-11 and n 17, 711 P2d 966 (1985), the court said that it is not self-evident that section 8 entitles a television station to copy a videotape of a deposition that had been played in open court and that it had not been given any persuasive rationale that would support "such a claim.

right of access to places traditionally open to the public, as criminal trials have long been, may be seen as assured by the amalgam of the First Amendment guarantees of speech and press." *Id.* at 577. Nonetheless, it acknowledged that the right to access to criminal trials is not expressly provided for in the First Amendment. *Id.* at 579. However, it reasoned:

> "Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights. Yet these important but unarticulated rights have nonetheless been found to share constitutional protection in common with explicit guarantees. * * *

> "We hold that the right to attend criminal trials is implicit in the guarantees of the First Amendment; without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.' " *Id.* at 580-81 (footnote omitted) (quoting *Branzburg v. Hayes*, 408 US 665, 681, 92 S Ct 2646, 33 L Ed 2d 626 (1972)).

Relying on the above language, petitioners assert that the language in Article I, section 8, is "stronger and more inclusive" than the language of the First Amendment, and, thus, it follows that Article I, section 8, must be interpreted to include public access to executions, including the pre-execution procedures. We disagree with petitioners' argument. First, the language in Article I, section 8, provides that "[n]o law shall be passed restraining the free expression of opinion." There is nothing in the language of section 8 that expressly provides support for petitioners' argument. Thus, their argument hinges on interpreting section 8, to provide for an "implicit" right to access to government activities and involves an additional step in logic. Not only must petitioners demonstrate that the right of access to government activities is part of section 8, but they must also show that such a right extends beyond trial court proceedings to the kinds of events they desire to witness.

Petitioners' premise that Article I, section 8, is to be interpreted more expansively than its First Amendment counterpart regarding access to public trials is incorrect. The framers of the Oregon Constitution provided separately for a right to public trials in Article I, section 10, which provides that "[n]o court shall be secret." During the debates leading up to the formation of the Oregon Constitution, the framers discussed the federal bill of rights and how they should be incorporated into the Oregon Constitution. One constitutional delegate expressed his views as follows:

> "Believing, as I do, that these declarations, thus solemnly made by a convention and ratified by the people, will always not only command universal respect, but the attention of courts, I desire that such a bill may precede or become a part of our constitution. It is a sort of manual—a sort of textbook of weighty matters, placed there multum in parvo * * *. They are there in monosyllables; and although individuals of common capacity, or of ordinary pursuits, may not be regarded as expounders of the constitutional law, yet the doctrine is contained, the declarations embodied in that bill of rights, and the meanest capacity can understand them. * * *

> "For these reasons, then, I am in favor of all the essential principles of a bill of rights. The question, then, seems to be, how they shall be put in. I am in favor of having them embodied in a separate clause by themselves, for the reason that they are more easily referred to. *They can be more evidently set forth by a separate and distinct article.* * * *

> "* * * * *

> "Now, I propose to avoid the first causes of this confusion. I propose to put under the head of legislative department whatever restricts that department, and my form shall be this: The legislature shall not have power to pass a law upon this question or that question, *so that when a man wishes to know what power is taken from the legislature he can see it in plain and express terms, and there can be no difficulty in understanding them.*" Charles Henry Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857*, 101-03 (1926) (emphasis supplied).

The format of the Oregon Constitution is a reflection of that expression. Article I's Bill of Rights as originally

adopted contained more than 30 sections. In contrast, the *Richmond Newspaper* court provided for a right to access to criminal trials through the First Amendment after deciding that there were no other express provisions in the federal bill of rights that provided for such access. The court examined the history underlying modern criminal trial procedure. It traced the roots of the court system back to England before the Norman Conquest and noted that local courts at that time "were attended by the freemen of the community." The court explained that "[s]omewhat like modern jury duty, attendance at these early meetings was compulsory on the part of the freemen, who were called upon to render judgment." The court also relied on Lord Edward Coke's Institutes of the Laws of England in which Coke said: "These words [*In curia Domini Regis*] are of great importance, for all Causes ought to be heard, ordered, and determined before the Judges of the King's Courts openly in the King's Courts, whither all persons may resort." *Richmond Newspaper*, 448 US at 565 n 6 (quoting 2 E. Coke, Institutes of the Laws of England 103 (6th ed 1681)). The court concluded that "the historical evidence demonstrates conclusively that at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." *Id*. at 569.

As the court proceeded in its analysis in *Richmond*, it noted that it was important not to read into the constitution rights not explicitly defined. Nonetheless, it said, "the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Id*. at 579. It then concluded the historical right to attend trials is an implicit right within the guarantees of the First Amendment because "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'" *Id*. at 580 (quoting *Branzburg*, 408 US at 681). Thus, the impetus for the *Richmond* court's decision to provide an implicit guarantee in the First Amendment of the right to attend criminal trials is lacking in Oregon. Article I, section 10, already provides for the right of access to criminal trials that petitioners contend we should read into section 8 as the predicate to holding that section 8 implicitly provides for unfettered

access to pre-execution procedures. Under the circumstances, we decline petitioners' invitation.[5] Accordingly, we reject petitioners' argument.

■     Petitioners also contend that OAR 291-024-0065, OAR 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 and OAR 291-024-0080 violate the First Amendment. First, it is important to note that petitioners, as media representatives, do not argue that the media is entitled to any special access to executions. Instead, they argue that the rules violate the First Amendment "because they prohibit any access *by* the public to execution procedures." In that light, ORS 137.473(1) provides that "[a]ll executions shall take place within the enclosure of a Department of Corrections institution designated by the Director of the Department of Corrections." OAR 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 provides that "[a]ll executions in the State of Oregon shall take place within the enclosure of the Oregon State Penitentiary." Petitioners do not challenge the constitutionality of ORS 137.473(1) or OAR 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. Apparently, the import of their argument is that the First Amendment requires the state to admit the public to the Oregon State Penitentiary in order to view all stages of an execution process.

We can find no United States Supreme Court case which holds that the public has an unqualified right of access to penal institutions under the First Amendment. In *Pell v. Procunier*, 417 US 817, 94 S Ct 2800, 41 L Ed 2d 495 (1974), the Court held that the press did not have any special rights to gain access to the interior of a state penitentiary. In that case, prison inmates and the media challenged a rule prohibiting the media from specifically designating inmates whom they wished to interview. The rule was designed to prevent inmates from becoming "public figures" within the prison society, which would help them obtain a disproportionate

---

[5] Justice Linde, in his concurrence in *State ex rel Oregonian Pub. Co.* wrote:

"[Article I, section 8,] assures reporters and editors, along with any other observer or interested citizen, the freedom to discuss what they know, or think they know, or surmise, or advocate, without fear of sanctions beyond civil damages for private harm. * * * But this unrestrained freedom to speak, write, print, and express opinions 'on any subject whatever' is not itself an 'Open, Sesame' to public offices, or records, or other information. It does not give journalists a constitutional claim to the information which it gives them the freedom to publish. That they are left to get for themselves." 289 Or at 287.

degree of notoriety and influence among their fellow inmates. *Id*. at 831-32. The Court held the First Amendment inapplicable:

"The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally. It is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources * * * and that government cannot restrain the publication of news emanating from such sources. * * * It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. That proposition finds no support in the words of the Constitution or in any decision of this Court." *Id*. at 834 (footnote omitted; citations omitted).

The Court also explained that it would defer to prison administrators to determine what regulations are appropriate for purposes of safety in a prison environment:

"Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id*. at 827.

In *California First Amendment Coalition v. Calderon*, 150 F3d 976 (9th Cir 1998), the Ninth Circuit held that a California statute, almost identical to the rules at issue in this case, does not violate the First Amendment rights of either the press or the public. The court explained:

"Procedure 770 allows witnesses to view an execution from just after the IV has been inserted into the condemned and a saline solution is running until the condemned is pronounced dead. This procedure does not cut off all access to information regarding executions. Rather, Procedure 770 allows for some access and observation, while it minimizes the exposure of the members of the execution team to the

media or other witnesses, out of a concern for staff safety and institutional security.

"We stress that we are not holding that the public and the press do not have First Amendment's right to view executions. Rather, our holding is limited to the facts of this case. Calderon asserts that the limitations on viewing contained in Procedure 770 are 'directly related to prison security, staff safety, and the orderly operation of the institutional procedure.' The procedures surrounding an execution 'are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.' *Pell*, 417 US at 827. We do not have substantial evidence indicating an exaggerated response here and, therefore, defer to prison officials in this matter. Whatever First Amendment protection exists for viewing executions, it is not violated by Procedure 770." *Id.* at 982-83 (footnote omitted).

In this case, the rules themselves provide the reason for the limitation on access to pre-execution procedures. OAR 291-024-0005(3)(a) provides:

"It is the policy of the [Department] to discharge its statutory responsibility to carry out death sentences imposed under Oregon law in a manner that is consistent with Oregon statutes, and with the safe, secure and orderly management and operation of the Oregon State Penitentiary, the safety and security of Department staff and other persons directly involved in the execution process, and their families, with due regard for the dignity of the condemned inmate, and with the limitations of space and resources. Consistent with these policies, executions will be conducted in a manner designed to protect as completely as possible the anonymity of Department staff and other persons involved."

Because this case is on review under ORS 183.400, petitioners have not established any factual record that questions the Department's policy statement. As such, we defer to the Department's policy, as stated in the rule, that such rules are necessary for institutional security. In light of all of the

foregoing considerations, we conclude that there is no absolute First Amendment right to view pre-execution procedures. Whatever right to public access to executions that may exist, the right may be qualified by administrative regulations reasonably related to the safety of inmates, prison staff and others within the prison walls.[6] On their face, OAR 291-024-0065, OAR 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 and OAR 291-024-0080 are constitutional exercises of the authority granted to the Department to promulgate rules to insure the safety of those involved in the administration of executions.

## II. THE RIGHT OF THE DEPARTMENT TO LIMIT DISCLOSURES ABOUT PERSONS ENGAGED IN THE EXECUTION PROCESS

■ Petitioners also contend that OAR 291-024-0017-(2)(b), (c) and (e) and OAR 291-024-0020(3)(d)(D) violate Article I, section 8, and the First Amendment because they limit freedom of expression. OAR 291-024-0017 provides:

"(1) Persons invited by the Superintendent of the Oregon State Penitentiary ('Penitentiary') who wish to attend and witness the execution of a Department inmate shall sign and strictly observe an access agreement drawn by the department that establishes the terms and conditions of access to the Penitentiary for the purpose of attending and witnessing the execution. * * *

"(2) Terms and Conditions of Access: The witness access agreement shall specify, at a minimum, the following terms and conditions of access to the Penitentiary:

"* * * * *

"(b) Covenant of Nondisclosure. In order to protect the safety and security of Department staff and other persons involved in the conduct of the execution and the supervision of the condemned inmate, and the safety and security of their families, and to protect the personal privacy interests of such persons and insure their anonymity, witnesses shall not disclose either directly or indirectly in any manner

---

[6] We need not decide whether members of the public have a right to attend the execution itself under the First Amendment or otherwise on the ground that, historically, executions were public events. Petitioners do not argue that they have been denied access to executions, only to the pre-execution procedure.

whatsoever the physical appearance, attributes, character-istics or any other fact that would have a tendency to reveal the identity of any person, excluding only the Superintendent, that is directly involved in the conduct of the execution or supervision of the condemned inmate * * *.

"* * * * *

"(C)   * * * The covenant of nondisclosure will not apply to any information now or hereafter voluntarily disseminated by the Superintendent or Department to the public, or which otherwise becomes part of the public domain through lawful means.

"(c)   Remedies. Witnesses shall agree that in the event that they disclose information in violation of the access agreement, the Department is entitled to specific performance, including immediate issuance of a temporary restraining order or preliminary injunction enforcing the access agreement, and to judgment for damages caused by the witness' breach, and to any other remedies provided by law.

"(d)   Special Terms and Conditions of Access Applicable to Media Witnesses. Media witnesses, in addition to observing the general terms and conditions of access and covenant of nondisclosure applicable to all witnesses, shall return to the Oregon Department of Corrections Media Center ('Media Center') at the Penitentiary immediately following the execution to brief those media representatives assembled regarding their observations of the execution and to answer the media representatives' questions. Media witnesses shall not file their own reports until after they have completed their responsibilities as pool reporters. Any media witness who fails to adhere to the terms and conditions of the access agreement may be barred from further access to the Penitentiary for purposes of attending, witnessing and reporting on executions. The Department may, in its discretion, also bar all other representatives of the media organization represented by the media witness."

OAR 291-024-0020(3)(d)(D) provides:

"(d)   In order to enter the secure perimeter of the Penitentiary, all persons and witnessing the execution shall:

"* * * * *

> "(D)  Sign and agree to abide by the terms of the witness access agreement, as provided in OAR 291-024-0017."

In substance, these rules require that all persons invited to an execution must agree to certain restrictions on their freedom of expression in order to witness an execution. The issue is whether the imposition of such restrictions violates Article I, section 8, and/or the First Amendment.

It is noteworthy that there is no statutory right for the media to attend an execution. ORS 137.473(1) provides a statutory right of access to only certain individuals. It provides, in part:

> "At the request of the defendant, the superintendent shall allow no more than two clergymen designated by the defendant to be present at the execution. At the discretion of the superintendent, no more than five friends and relatives designated by the defendant may be present at the execution. The superintendent shall allow the presence of any peace officers as the superintendent thinks expedient."

Rather, they argue that the rules act as an unconstitutional prior restraint on the expression of those who are invited to attend the execution pursuant to the statute. We assume without deciding that petitioners can attack the constitutionality of the rules even if they are not among the enumerated persons in the statute. More importantly, the rules act as a restraint on those members of the media who have been invited to witness the execution. The restrictions prevent all persons who view an execution from disclosing the identity of the officials involved in the execution process.

The Department points out that the restrictions are for the purpose of ensuring the privacy and the safety of the Department's employees who are involved in the execution process. OAR 291-024-0005(3)(a) provides that the Department must ensure that death sentences are carried out in a manner to provide for "safety and security of Department staff and other person directly involved in the execution process." OAR 291-024-0017(2)(b) provides that "[i]n order to protect the safety and security of Department staff and other persons involved in the conduct of the execution * * * and to protect the personal privacy interests of such persons and

insure their anonymity, witnesses shall not disclose" their identity.

We turn first to petitioners' contention that OAR 291-024-0017(2)(b), (c) and (e) and OAR 291-024-0020-(3)(d)(D) violate Article I, section 8, of the Oregon Constitution. Petitioners argue that the two rules constitute an unconstitutional limitation on their right freely to express to others what they observe at an execution. They rely on the court's holding in *State ex rel Sports Management News v. Nachtigal*, 324 Or 80, 921 P2d 1304 (1996). In that case, the statute in issue required the trial court to preserve the secrecy of an alleged trade secret and mandated that any person involved in the litigation not disclose an alleged trade secret without prior court approval. ORS 646.469. The court held that the statute on its face violated Article I, section 8, because it restricted the content of speech and the restrictions did not fall within a historical exception to section 8. Petitioners contend that the facts in this case are parallel to those in *Nachtigal* because

"[h]ere, by administrative rule, the [Department] is attempting to prevent disclosure of facts in order to preserve in secrecy the identity of persons involved in the execution process. In *Nachtigal*, it was a statute attempting to prevent the disclosure of trade secrets. In neither case, here [n]or in *Nachtigal*, is the subject of expression, the identity of personnel or the identity of trade secrets, one that is excluded from speech and expression protected by Article I, section 8, of the Oregon Constitution. In each case, here and in *Nachtigal*, the focus of the law is on nondisclosure of facts."

This case differs from *Nachtigal*. What petitioners fail to point out about the holding in *Nachtigal* is that the court determined that the statute in that case violated section 8 because it could be applied to "third-party publishers,"[7] who did not learn about a trade secret illegally or who were not under a duty to preserve a trade secret. The court explained that its holding did not encompass the situation in

---

[7] The plaintiff-relator in *Nachtigal* was the publisher of a weekly trade newsletter, which announced that a shoe manufacturer was planning to introduce a new design of running shoe. The manufacturer alleged that the newsletter had obtained a copy of its internal, confidential specifications.

which the prior restraint on expression was applied only to an employee bound to a confidentiality agreement or against a publisher who had broken the criminal law to obtain trade secrets. *Id.* at 89 n 8. Here, the restrictions are imposed as a condition to the acceptance of the Department's invitation to attend an execution. The information about who is involved in the execution process is not public information and is not accessible unless the witnesses or media representatives first agree to the Department's restriction. There is no possible application of the rules to "third-party publishers." Because petitioners are bound by an agreement that requires them to keep the identities of prison officials confidential, the holding in *Nachtigal* is inapposite.

Typically, when statutes or rules provide for a prior restraint on the content of expression as do the rules in this case, the statute or rule is unconstitutional unless a historical exception exists. *State v. Robertson*, 293 Or 402, 412, 416-17, 433-34, 649 P2d 569 (1982). However, the content/historical exception analysis does not necessarily apply under circumstances where the restraint on expression is not a general prohibition against anyone who might disclose or discuss the details of a government activity, but is a restraint on the expression of one who undertakes to exercise official responsibility that carries with it attendant obligations of confidentiality. For instance, in *In re Lasswell*, 296 Or 121, 125, 673 P2d 855 (1983), the issue was whether a restriction in a disciplinary rule on a prosecutor that prohibited communication about a pending prosecution was constitutional under section 8. The court explained that the *Robertson* test was not controlling, because the rule at issue

> "is not a general prohibition against anyone who might disclose or discuss facts bearing on a pending criminal prosecution. The parts of [the rule] involved here are addressed specifically to '[a] lawyer * * * associated with the prosecution of a criminal matter.' And the potential sanction, though of course serious to a lawyer, is not punitive but professional. It is civil, not penal. The provisions relevant here are not even addressed to all lawyers but to prosecutors, who are officially and professionally responsible for proceeding with due regard for the prosecuted person's right to a fair trial by an impartial jury."

In this case, the restraint on expression contemplated by the rules is also not a general prohibition against expression. Instead, it is directed at witnesses to executions who receive a *quid pro quo* in exchange for their agreement to keep certain observations confidential, *i.e.*, the ability to view an execution. The rules expressly provide that "witnesses" enter into an agreement to keep confidential the identity of the persons involved in the execution process as a condition of access to information. Moreover, the covenant of nondisclosure is limited in nature. It does not apply to "any information now or hereafter voluntarily disseminated by the Superintendent or Department to the public, or which otherwise becomes part of the public domain through lawful means." OAR 291-024-0017(1)(C). Thus, under the rules, a witness or media representative agrees to waive limited rights of expression under section 8 in exchange for the opportunity to be present at an execution.

In that sense, the waiver contemplated by the rules is analogous to a public employee who enters into an agreement with a public body that requires that the employee personally not exercise certain constitutional rights in exchange for the privilege of working for the public body. A public body is not free to require unconstitutional prerequisites to the attainment of official positions. On the other hand, it does have the authority, without violating the constitution, to enforce rules that require employees to waive their constitutional rights so long as the waiver bears a reasonable relationship "to the promotion of efficiency, integrity, and discipline of the public service and [the rules] are not arbitrary or discriminatory." *Minielly v. State*, 242 Or 490, 498-99, 411 P2d 69 (1966).

Our inquiry then is whether the underlying purposes for the rules in this case have a reasonable nexus to the restraint that they impose on expression. The rules provide that witness are not allowed to "reveal the identity of any person, excluding only the Superintendent, that is directly involved in the conduct of the execution or supervision of the condemned inmate." Their purpose is expressed within the rule itself:

"[T]o protect the safety and security of Department staff and other persons involved in the conduct of the execution * * *, and the safety and security of the their families, and to protect the personal privacy interests of such persons and insure their anonymity."

The Department argues that "allowing the identities of those who carry out the sentence of death to become public would increase the chances that those persons would be subjected to attacks by other inmates, thereby threatening institutional security." When it comes to determining what is in the best interest for the safety and security of the prison under the circumstances, again, we elect to defer to the Department's judgment. We conclude that the reach of the rules prohibiting the revelation of the identity of prison officials involved in the execution process is reasonably related to the promotion of the safety of prison officials, their families and others who work or reside within the penitentiary. Therefore, they do not violate section 8.

Petitioners also argue that the rules violate the First Amendment. Under the First Amendment, when one voluntarily assumes "a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." *United States v. Aguilar*, 515 US 593, 606, 115 S Ct 2357, 132 L Ed 2d 520 (1995). Instead, the Court proceeds to balance the government's interest in imposing the restriction against the restraint on the constitutional right. For instance, the court in *United States v. Marchetti*, 466 F2d 1309, *cert den* 49 US 1063 (1972), ruled that the federal government could constitutionally impose secrecy requirements on its employees (in that case, a Central Intelligence Agency officer) and enforce the restrictions through a system of prior censorship, so long as the information was classified and not officially disclosed to the public. On balance, we hold that the interests of safety of prison personnel outweigh the interest of reporting the identity of those involved in the execution process. As we previously discussed, the rules provided for a limited waiver of rights of expression and are reasonably related to the promotion of safety of prisons officials, their families and others

who work or reside within the penitentiary. Accordingly, we conclude that the rules do not violate the First Amendment.

Petitioners' other arguments do not require discussion in light of our holdings and the rationales underlying them. In summary, we hold that OAR 291-024-0017(2)(b), (c) and (e), OAR 291-024-0020(3)(d)(D), OAR 291-024-0065, OAR 291-024-0070 and OAR 291-024-0080 do not violate Article I, section 8, or Article I, section 10, of the Oregon Constitution, or the First Amendment to the United States Constitution in any way that petitioners assert.

Rules held valid.